# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Charles John Guetti,

      Plaintiff,

v.

Carolyn Colvin,
Commissioner of Social Security,

      Defendant.

**Civil No. 12-cv-3004 (MJD/SER)**

**<u>REPORT AND RECOMMENDATION</u>**

---

    Jennifer G. Mrozik, Esq., Hoglund, Chwialkowski & Mrozik, PLLC, 1781 West County Road B, Roseville, Minnesota 55113, for Plaintiff.

    Ana H. Voss and Gregory G. Brooker, Esqs., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge.

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Charles John Guetti ("Guetti") seeks review of the Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits ("DIB").[1]  *See* (Compl.) [Doc. No. 1].  The parties filed cross-motions for summary judgment ("Guetti's Motion for Summary Judgment" and "Commissioner's Motion for Summary Judgment" respectively) [Doc. Nos. 9, 13] that have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and District of Minnesota Local Rule 72.1.  For the reasons set forth below, the Court recommends that Guetti's

---

[1]    In the Administrative Law Judge's denial of Guetti's claims, he noted that Guetti had claimed for period of disability, disability insurance benefits, and supplemental security income. (Admin. R.) [Doc. No. 7 at 10].  Although the Court notes the difference, it has no impact on the Court's analysis.

Motion for Summary Judgment be denied and the Commissioner's Motion for Summary Judgment be granted.

## I.     BACKGROUND

### A.     Procedural History

Guetti protectively filed his applications in October 2010.[2]  (Admin. R. at 141–53).  In both applications, Guetti alleged a disability onset date ("AOD") of September 1, 2009, due to lower spine damage.  (*Id.* at 141, 148, 167).  Guetti's applications were denied initially on January 28, 2011, and again upon reconsideration on June 14, 2011.  (*Id.* 87–91, 96–101).  Following a request from Guetti, Administrative Law Judge ("ALJ") Timothy J. Christensen heard the matter.  (*Id.* at 10–18, 28–41).  The ALJ issued an unfavorable decision determining Guetti did not meet the statutory requirements for being disabled.  (*Id.* at 10–18).  The Appeals Council denied Guetti's request for review of the ALJ's decision.  (*Id.* at 1–4).  The denial of further review rendered the ALJ's decision final.  (*Id.* at 1).  Guetti now seeks judicial review pursuant to 42 U.S.C. § 405(g).  (Compl. at 2).

---

[2]     Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits.  The effect of a protective filing is to preserve the date of application.  For example, if a hypothetical claimant sends a letter postmarked to Social Security Administration on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she sends her application on March 27.  Program Operations Manual System ("POMS"), GN 00204.010C.5a–e. (SSA, Aug. 6, 2013).   There is no special format for a protective filing, as long as it clearly expresses intent to file, although oral statements of intent to file for Title II benefits must be documented and signed by a SSA employee.  POMS, GN 00204.010B.1  –  GN  00204.010B.4.  (SSA,  Aug.  6,  2013), *available at*  https://secure.ssa.gov/apps10/poms.nsf/ lnx/0200204010.

## B.     Plaintiff's Background and Testimony

At the AOD, Guetti was fifty-four years old.[3]  (Admin. R. at 16, 42).  Guetti worked as a carpenter, dish washer, cook, and cabinet maker previously.  (*Id.* at 38).  Guetti testified at the hearing that he had tried various treatments for his back pain, including physical therapy, electrical nerve stimulation, home exercises, injections, and medications.  (*Id.* at 32).  Guetti was taking two Percocet pills twice a day to deal with his pain.[4]  (*Id.*).  The Percocet, however, causes side effects, which Guetti identified as "creat[ing] sleeplessness, and it's difficult to stay awake at points.  . . . I have trouble like balancing [a] checkbook. . . ."  (*Id.* at 32–33).  Concerning his trouble with balancing a checkbook, Guetti testified that at times he inverts numbers and misspells names.  (*Id.* at 33).

Guetti testified that he can stand for twenty minutes, can go to the grocery store and shop if it is only for ten minutes, and that he tries to help out around the house doing things like making the bed, putting in a load of laundry, and doing dishes.  (*Id.* at 34–36).  Guetti indicated that he cannot sit for very long periods of time.  (*Id.* at 35).  Guetti also indicated that his pain level varies.  (*Id.* at 35–36).

## C.     Relevant Medical Record Evidence

### 1.     Medical Records Before September 1, 2009

Before Guetti's AOD, he saw various doctors for his low back pain.  On October 3, 2008, Guetti saw Dr. Eric A. Poulin ("Dr. Poulin") for back pain.  (Admin. R. at 216).  Dr. Poulin

---

[3]     Guetti is now fifty-five years old and is considered a person of advanced age.  20 C.F.R. § 404.1563(e).

[4]     Percocet is an opioid analgesic that is "indicated for the relief of moderate to moderately severe pain."  Endo Pharmaceuticals, *PERCOCET- oxycodone hydrochloride and acetaminophen tablet*, http://www.endo.com/File%20Library/Products/Prescribing %20Information/PERCOCET_ prescribing_information.html#endoanchor-1 (last visited Nov. 26, 2013).

noted that Guetti had back pain "for about a week" and felt pain down his right leg, which over the counter ("OTC") analgesics did not alleviate.[5] (*Id.*). Dr. Poulin diagnosed Guetti with sciatica and ordered a Magnetic Resonance Imaging ("MRI") to check for disc herniation and low back pain.[6] (*Id.*). Dr. Poulin prescribed Guetti medications including Percocet for his pain. (*Id.*).

On November 7, 2008, Guetti had a follow-up with Dr. Poulin for management of his back pain. (*Id.* at 217). Dr. Poulin noted that a small disc herniation was found that was thought to be causing sciatica and that Guetti has osteoarthritis of the lumbar spine.[7] (*Id.*). Guetti reported that the back pain radiated down his leg and was chronic. (*Id.*). Guetti stated that this pain limited his activity. (*Id.*). Dr. Poulin diagnosed Guetti with sciatica with "[s]evere low

---

[5]     An analgesic is "[a] compound capable of producing analgesia, *i.e.,* one that relieves pain by altering perception of nociceptive stimuli without producing anesthesia or loss of consciousness." *Stedman's Medical Dictionary*, Analgesic (27th ed. 2000).

[6]     An MRI is "a diagnostic radiologic modality, using nuclear magnetic resonance technology, in which the magnetic nuclei (especially protons) of a patient are aligned in a strong, uniform magnetic field, absorb energy from tuned radiofrequency pulses, and emit radiofrequency signals as their excitation decays. These signals, which vary in intensity according to nuclear abundance and molecular chemical environment, are converted into sets of tomographic images by using field gradients in the magnetic field, which permits 3-dimensional localization of the point sources of the signals." *Stedman's Medical Dictionary*, Imaging, Magnetic Resonance Imaging (27th ed. 2000).

Sciatica is "[p]ain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction (hence the term), but now known to usually be due to herniated lumbar disk compromising a nerve root, most commonly the L5 or S1 root." *Stedman's Medical Dictionary*, Sciatica (27th ed. 2000).

A herniation is a "[p]rotrusion of an anatomic structure (*e.g.,* intervertebral disk) from its normal anatomic position." *Stedman's Medical Dictionary*, Herniation (27th ed. 2000).

[7]     Osteoarthritis is "[a]rthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal ostephytes; pain and loss of function result; mainly affects weight-bearing joints, is more common in older persons." *Stedman's Medical Dictionary*, Osteoarthritis (27th ed. 2000).

back pain with radiation down right leg." (*Id.*). Dr. Poulin noted an abnormal MRI and two failed epidural steroid injections.[8] (*Id.*). Dr. Poulin also changed Guetti's pain medication "in anticipation of a longer need for opioids for pain." (*Id.*).

On December 1, 2008, Guetti followed up with Dr. Jack Schwinghamer ("Dr. Schwinghamer"). (*Id.* at 219). Guetti said that he had been feeling worse with a significant increase in back pain since September 2008. (*Id.*). Dr. Schwinghamer noted that an MRI showed a L4 disc herniation and that a steroid injection failed to relieve Guetti's pain but Percocet provided some relief. (*Id.*). Dr. Schwinghamer noted that Guetti currently had some improvement in his pain. (*Id.*). Percocet was prescribed but was not considered a long-term solution. (*Id.* at 220).

Guetti returned to Dr. Schwinghamer for his low back pain and Guetti explained that the pain had been improving and was causing little to no radicular pain approximately two months later. (*Id.* at 221). Guetti also noted that he was experiencing arm numbness when sleeping and needed a colonoscopy.[9] (*Id.*). Dr. Schwinghamer diagnosed Guetti with low back pain and noted a previous diagnosis of lumbago.[10] (*Id.*). Dr. Schwinghamer performed an annual physical exam, ordered a colonoscopy, lipid panel, glucose test, and a physical therapy consultation for his low back pain. (*Id.* at 223).

---

[8]     Epidural steroid injections "contain drugs that mimic the effects of the hormones cortisone and hydrocortisone. When injected near irritated nerves in [the] spine, these drugs may temporarily reduce inflammation and help relieve pain." Richard H. Rho, M.D., *Back Pain-Epidural Steroid Injections: Why Limited Dosing?*, Mayo Clinic (Mar. 9, 2013), http://www.mayoclinic.com/health/epidural-steroid-injections/AN01892.

[9]     Radicular is defined as "[r]elating to a radicle[,]" where radicle means "[a] rootlet or structure resembling one, as the *radicle* of a *vein*, a minute veinlet joining with others to form a vein, or the *radicle* of a *nerve*, a nerve fiber that joins others to form a nerve." *Stedman's Medical Dictionary*, Radicular, Radicle (27th ed. 2000).

[10]     Lumbago is defined as "[p]ain in mid and lower back; a descriptive term not specifying cause." *Stedman's Medical Dictionary*, Lumbago (27th ed. 2000).

On March 3, 2009, Guetti had a physical therapy appointment for his low back pain.  (*Id.* at 213).  Physical therapy was to continue two times a week for up to six to eight weeks.  (*Id.*).  At the March 3 appointment, Guetti complained of chronic low back pain and rated his symptoms at "a level of 5/10 at rest," but he indicated that "they can increase to a level of 9/10 with activity."  (*Id.* at 214).  Guetti reported an improvement in his back pain.  (*Id.*).  At this visit Guetti also chronicled his "significant history of low back pain" and multiple treatment options he had already tried.  (*Id.*).  Guetti complained that a recent flare up of his back pain caused radicular symptoms down his right leg to his calf.  (*Id.* at 215).  At the appointment, Guetti learned about his condition and how physical therapy relieves the pain; fifteen minutes of mechanical traction was applied to relieve the pain in Guetti's spine.  (*Id.*).

On March 19, 2009, Guetti saw Dr. Schwinghamer for a follow-up appointment for back pain.  (*Id.* at 224).  Dr. Schwinghamer noted that Guetti had been feeling better overall for the past week and had not had any radiation in his legs.  (*Id.*).  Guetti experienced increased pain the preceding week when doing physical therapy and splitting wood, which subsided when his activity decreased.  (*Id.*).  Dr. Schwinghamer encouraged Guetti to do more stretching, do less physical therapy, and to continue periodic Percocet.  (*Id.*).

Guetti followed up with Dr. Schwinghamer approximately three months later for radiating back pain.  (*Id.* at 226).  Dr. Schwinghamer directed Guetti to continue with the Percocet and an over-the-counter nonsteroidal anti-inflammatory drug ("NSAID") and advised Guetti to stay active and work on back exercises.[11]  (*Id.*).  Dr. Schwinghamer also noted that Guetti had seen a spine specialist and was not interested in surgery.  (*Id.*).

---

[11]  An NSAID is a nonsteroidal anti-inflammatory drug, such as aspirin or ibuprofen. *Stedman's Medical Dictionary*, NSAID (27th ed. 2000).

## 2.    Medical Records After September 1, 2009

On February 25, 2010, Guetti saw Dr. Schwinghamer and described left foot pain and toe numbness.  (*Id.* at 227).  Guetti stated that he still had pain in his lower back and could feel a protrusion there.  (*Id.*).  Guetti experienced pain in his right leg for several months and a worsening of his back pain.  (*Id.*).  Dr. Schwinghamer continued Guetti's Percocet, added other medications, and noted that if Guetti has increased pain he may want to have an MRI done for a potential bulging disc in his lower back.  (*Id.*).  Dr. Schwinghamer noted that Guetti "has remained active and is still working [at] his restaurant and has not been limited in his activities." (*Id.*).

On October 20, 2010, Guetti saw Dr. Matthew Allen ("Dr. Allen") to establish care.  (*Id.* at 229).  Guetti explained that he had low back pain that extended down his leg, which was getting a little worse.  (*Id.*).  Guetti had not done physical therapy for two years.  (*Id.*).  Guetti was losing his job at the diner at the end of the month.  (*Id.*).  Dr. Allen continued the Percocet and discussed the natural progression of low back pain and chronic pain management.  (*Id.* at 230).  Dr. Allen discussed the possibility of decreasing the dose of Percocet.  (*Id.*).  If Guetti received Medicaid, Dr. Allen advised physical therapy.  (*Id.*).  Dr. Allen also suggested that Guetti consider a MRI, another consultation with a neurosurgeon, and a pain consultation.  (*Id.*). On November 22, 2010, Dr. Allen completed a Medical Opinion Form for Guetti which diagnosed him as having low back pain.  (*Id.* at 339).  Dr. Allen noted that Guetti was not compliant with his treatment plan because of a lack of insurance.  (*Id.*).  Dr. Allen checked a box indicating that "[p]atient will not be able to perform any employment in the foreseeable future." (*Id.*).  Next to this, however, the provider wrote "[r]eassess in 1 month."  (*Id.*).

On November 29, 2010, Guetti saw Dr. Brian D. Niskanen ("Dr. Niskanen") for an evaluation of his right shoulder which he had injured the previous week. (*Id.* at 231). Guetti expressed that he was in constant pain and was not sleeping well. (*Id.*). Dr. Niskanen administered an injection of pain medications with some improvement and then a trigger point injection with further improvement. (*Id.*). Dr. Niskanen diagnosed Guetti as having a "trapezius strain with subsequent cervical spasm/torticollis." (*Id.*).

Another Medical Opinion Form was completed on December 30, 2010.[12] In the opinion, Guetti was diagnosed as having low back pain that lasted for more than thirty days. (*Id.* at 336). The provider checked a box indicating that "[p]atient will not be able to perform any employment in the foreseeable future." (*Id.*). Next to this, however, the provider wrote "[r]eexamine [in] 1 month." (*Id.*).

On January 7, 2011, Guetti went to the Emergency Room for his chronic low back pain. (*Id.* at 242). Guetti was discharged and was given two refills on his Percocet prescription. (*Id.*).

About three weeks later, Guetti saw Dr. Mark Hruby ("Dr. Hruby") for a follow-up for chronic pain management in the low back and right leg, to establish care, and to complete a Medical Opinion Form. (*Id.* at 310). Guetti noted that at times, his pain was a 10/10 with 10 being excruciating pain and that his pain was a 5/10 at its least. (*Id.* at 307). Guetti noted that he is always in pain, it is gradually getting worse, and over the last six months he developed increased pain and numbness in his left foot. (*Id.* at 311). Guetti indicated that the pain was better when he laid flat and used his prescription medications. (*Id.* at 310–11). Guetti was also

---

[12] Although this Medical Opinion Form is signed by a doctor, the Medical Provider information is not completed and the Court cannot decipher the signature of the Medical Provider. *See* (Admin. R. at 336). Due to the similarity between this Medical Opinion Form and that completed by Dr. Allen in October 2010, the Court believes Dr. Allen to have completed this Medical Opinion Form as well, however, which medical provider completed the December 2010 Medical Opinion Form does not impact the Court's analysis. (*Id.* at 336, 339).

diagnosed as having recurrent major depression and was prescribed medications to treat his condition. (*Id.*). Dr. Hruby ordered an MRI of Guetti's lumbar spine as well as another physical therapy consultation. (*Id.*). Dr. Hruby completed a Medical Opinion Form at this visit where he diagnosed Guetti with low back pain lasting three months or more. (*Id.* at 335). Dr. Hruby reported that "[p]atient will not be able to perform any employment in the foreseeable future." (*Id.*).

On February 16, 2011, Guetti saw Dr. Hruby for an evaluation before a scan, and after his evaluation the scan was performed. (*Id.* at 240–41, 257–58, 301–07). Dr. Radha Inampudi ("Dr. Inampudi") completed an MRI Imaging Report for Guetti from a lumbar spine MRI. (*Id.* at 240–41, 257–58). Dr. Inampudi listed the following impressions from her review of Guetti's MRI: (1) a herniation without impingement and no significant stenosis and (2) multiple bulging discs. *See* (*id.* at 241, 258).

As Dr. Hruby suggested, Guetti attended six physical therapy sessions for his low back pain in February 2011. (*Id.* at 234–56). On February 7, 2011, Guetti saw Physical Therapist Jean Mork ("PT Mork") and stated that he had back pain for twenty-five years that was intermittent until 2008 when it became constant. (*Id.* at 234). Guetti had not worked since September 2009. (*Id.* at 235). Guetti complained of having difficulty "bathing, sitting down, bending, sleeping, dressing, stairs, driving, standing up, walking, jumping, lifting, working, reaching, running, tying shoes, performing dishes, laundry[,] and vacuuming." (*Id.*). The treatment administered was a home exercise program which relieved Guetti's lower extremity symptoms. (*Id.* at 236, 253). On February 14, 2011, Guetti again saw PT Mork and stated that he had been experiencing increased pain since the previous therapy session. (*Id.* at 237, 254). At the appointment Guetti refused lumbar traction but did do some conditioning of the lower

extremities and received some recommendations for his back pain. (*Id.*). On February 22, 2011, Guetti again reported to physical therapy and noted an increase in soreness attributable to the preceding week's therapy and requested a less aggressive treatment. (*Id.* at 238, 255). At the appointment, Guetti did conditioning and core stability exercises as well as strengthening exercises for his lower back. (*Id.*). Guetti also reviewed a video on the back and briefly reviewed his MRI. (*Id.*). The PT noted that Guetti still has pain with radicular symptoms but that he has modified his daily activities to assist in pain reduction. (*Id.*). On February 24, 2011, Guetti again went to physical therapy for his back. (*Id.* 239, 256). There were no real changes in Guetti's condition, some time was spent doing conditioning activities and watching a final back video and discussing how Guetti could do these exercises at home. (*Id.*). At this time PT Mork found it appropriate to refer Guetti back to his physician to possibly go to a specialist. (*Id.*). Physical therapy was discontinued. (*Id.*).

On February 28, 2011, Guetti saw Dr. Hruby for treatment and evaluation of depressive symptoms. (*Id.* at 297). Guetti's depression severity level was rated as moderate. (*Id.* at 298). Guetti was diagnosed as having recurrent major depression and hypertension.[13] (*Id.* at 299–300). Medications were prescribed for both. (*Id.* at 300–01).

On March 15, 2011, Dr. John C. Mullan ("Dr. Mullan") evaluated Guetti for potential low back surgery. (*Id.* at 270). Guetti complained of low back and leg pain. (*Id.*). Guetti explained that he was unemployed and that his symptoms were getting a little worse. (*Id.*). Guetti described back, leg, and foot pain and asserted that things were not particularly bad and that he could live with the symptoms. (*Id.*). Dr. Mullan reviewed Guetti's February 16, 2011

---

[13] Hypertension is "[h]igh blood pressure; transitory or sustained elevation of systemic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences." *Stedman's Medical Dictionary*, Hypertension (27th ed. 2000).

MRI.  (*Id.* at 271).  Dr. Mullan noted that it would be reasonable to see how things progressed for a while if his symptoms are not too severe and that there "certainly is nothing on the scan which mandates surgical intervention at this time."  (*Id.*).  Dr. Mullan also noted that there was not a straightforward, surefire way to treat Guetti's condition; nonetheless he made proposals for what surgery he recommended.  (*Id.*).

On April 27, 2011, Dr. Danielle M. Bergman ("Dr. Bergman") saw Guetti for Percocet refills and to complete a Medical Opinion Form.  (*Id.* at 296, 333).  Guetti noted that he was taking four to five Percocet's daily for his back pain and that he had discontinued physical therapy "because they were worried that he was doing more damage than good."  (*Id.* at 296). The report noted that Guetti walks around the block each day but that OTC medications and topical creams did not help with the pain.  (*Id.*).  Dr. Bergman advised that Guetti should try Tylenol and ibuprofen instead of Percocet and suggested that she would help him wean off Percocet; Guetti was opposed to Dr. Bergman's suggestion.  (*Id.* at 297).  Guetti obtained a one-month Percocet prescription so he could seek out other options like a pain clinic or another provider that may prescribe him narcotics.  (*Id.*).  Dr. Bergman also completed the Medical Opinion Form on this visit where she diagnosed Guetti as having chronic low back pain.  (*Id.* at 333).  Dr. Bergman reported that Guetti is unable to work at all in response to inquiries on the Medical Opinion Form asking whether Guetti could perform any employment or limited employment now.  (*Id.*).  Dr. Bergman also indicated that "patient will not be able to perform any employment in the foreseeable future."  (*Id.*).  Finally, Dr. Bergman reported that Guetti does not have developmental or learning disability, mental illness, or chemical dependency. (*Id.*).

Marlin Trulsen, Ph.D., ("Dr. Trulsen") examined Guetti on May 13, 2011, for depression. (*Id.* at 262). Guetti noted that he was not sure if he was depressed and that he did not think he felt any symptoms of depression. (*Id.* at 262–63). Guetti said that previously he used psychological/counseling services but was not currently using them. (*Id.* at 263). In addition, Guetti noted that he had used medication to deal with psychiatric issues before, but ceased using medication because the side effects outweighed the benefits. (*Id.*). Guetti explained that he had back pain that he rated at a 9/10 but that he used Percocet to help which reduced the pain to a 3/10. (*Id.*). Guetti also noted his hypertension. (*Id.*). When describing his current level of daily function, Guetti reported that he "is capable of doing his own cleaning, dishes, cooking, and laundry." (*Id.* at 264.) Guetti did note that he has trouble bending when doing the laundry but that he can do small loads. (*Id.*). Guetti noted that he could do some yard work because his medical limitation is "as tolerated" or could do shopping, but neither is required of him currently. (*Id.*). It was noted that Guetti appeared well-developed mentally to deal with a work situation. (*Id.* at 265–66). Dr. Trulsen diagnosed Guetti as having chronic adjustment disorder with a depressed mood. (*Id.* at 265).

In June 2011, Guetti attended four physical therapy sessions. (*Id.* at 277–80). PT Mork again saw Guetti for physical therapy for his back pain which he reported had gotten much worse in the previous two years. (*Id.* at 280). Guetti rated the pain as a 9/10 at rest and a 10/10 during activity. (*Id.*). PT Mork noted that Guetti was "very rigid as far as his motion in the lumbar spine with subjective complaints of very significant pain and tingling symptoms in the lower extremities bilaterally." (*Id.* at 281). During the session, PT Mork advised that Guetti needs to avoid "bending, lifting, twisting or prolonged sitting . . . [and] needs frequent change of his positions during his activities of daily living[.]" (*Id.* at 281–82). Later, on June 16, 2011, Guetti

reported to PT Mork a marked increase in symptoms especially down into his lower extremities later in the day. (*Id.* at 279). Guetti did note that he had been performing his exercises and did not associate his increased pain with the exercises but thinks that the pain may have been caused by packing boxes for an upcoming move. (*Id.*). PT Mork performed electrical stimulation on Guetti's low back which was well tolerated. (*Id.*). Guetti did not opine on whether the electric therapy improved his pain. (*Id.*). Guetti saw PT Mork again on June 27, 2011, and Guetti noted that he was sore and had to take a Percocet the day before. (*Id.* at 278). Guetti also explained that he had moved over the weekend which required some physical work from him. (*Id.*). Inferential current electrical stimulation was done and they discussed the possibility of a home unit for electrical stimulation of his back if the electric stimulation was beneficial. (*Id.*).

On June 30, 3011, Guetti was discharged from physical therapy after seven visits for his low back pain. (*Id.* at 277). Guetti decided to stop physical therapy because he was unsure about whether his health insurance would continue. (*Id.*). Guetti did continue to have "fairly significant complaints of low back pain, especially after having moved this past weekend." (*Id.*). An electrical stimulation machine was provided to Guetti for pain management. (*Id.*). Guetti was advised to continue with his exercise program at home and to use the electrical stimulation machine. (*Id.*).

On August 4, 2011, Guetti saw Dr. Matthew Schultz ("Dr. Schultz") concerning back pain with radiculopathy. (*Id.* at 293). Guetti noted that his low back is painful and he has primarily pain in his right leg with some also in his left foot. (*Id.*). Dr. Schultz notes "[Guetti] spends an inordinate amount of time thinking about the pain and has been doing some research on the internet about different treatment options." (*Id.*). Also, Guetti had been attempting to

decrease his Percocet use to four pills a day and had been using his electrical stimulation unit with limited success as his pain was basically unchanged. (*Id.*).

On August 29, 2011, Guetti had a radiological pelvis and bilateral hip exam. (*Id.* at 275). The exam showed that the "[b]ones of the pelvis and proximal femurs appear normal. Very mild arthritic changes involve the hip joint spaces." (*Id.*). Guetti, thus, was thought to have mild degenerative changes in his hip joints. (*Id.*). Guetti also had an ultrasound of his arterial lower right leg for his history of varicose veins and pain. (*Id.* at 276).

On September 1, 2011, Guetti saw Dr. Amir A Mehbod ("Dr. Mehbod") for a second opinion for his ongoing low back pain. (*Id.* at 288). Guetti described his history of back pain and its tendency to ebb and flow, but Guetti's main complaint was the pain in his right leg which was made worse during certain activities like standing and at certain times of the day. (*Id.*). Dr. Mehbod reviewed Guetti's February 2011 MRI with him. (*Id.* at 289). Dr. Mehbod diagnosed Guetti as having disc degeneration in his lumbar spine and spinal stenosis. (*Id.*). Dr. Mehbod discussed Guetti's pain with him and talked about surgery which Dr. Mehbod noted would not address Guetti's ongoing low back pain. (*Id.*).

On October 17, 2011, Guetti saw Dr. Schultz for his low back pain. (*Id.* 292, 330). Guetti told Dr. Schultz that he had seen two different neurosurgeons but was not considering surgery until next spring. (*Id.*). Dr. Schultz described "[f]or now, [Guetti] is getting along reasonably well with 4 Percocet tablets daily which keeps his pain at a functional level." (*Id.*). Guetti planned to continue with the Percocet as he had been for the past few years. (*Id.*).

On November 21, 2011, Guetti saw Dr. Schwinghamer for follow up for his high blood pressure and back pain. (*Id.* at 328). Guetti noted that he is still experiencing pain and is not working but would like to do something to stay active. (*Id.*). Guetti denied that he experienced

any depression. (*Id.*). Dr. Schwinghamer advised Guetti to continue stretching and strengthening activities and that "[Guetti] will look at trying to be more active and possible get back to work part[-]time if able." (*Id.* at 330). Guetti also was prescribed blood pressure medication again. (*Id.*).

On February 28, 2012, Guetti saw Dr. Schwinghamer for a follow-up on his back pain and blood pressure. (*Id.* at 326). Dr. Schwinghamer noted that Guetti had been feeling fairly good with some increased pain due to increased activity. (*Id.*). Dr. Schwinghamer noted that Guetti had sold a house. (*Id.*). Guetti felt as if he could not continue to work on the house due to his back because it required a lot of moving of equipment and supplies. (*Id.*). Guetti still had pain in his right leg and left foot as well and continued to consider surgery. (*Id.*). Guetti represented that he felt his back pain and radiation got worst over the past year. (*Id.*). Guetti's blood pressure had improved. (*Id.*).

On March 7, 2012, Guetti had an MRI of his lumbar spine. (*Id.* at 323). Dr. Stephen M. Fry ("Dr. Fry") read the MRI. (*Id.* at 324). Dr. Fry's impressions included foraminal narrowing, stenosis, disc protrusion, and degenerative disc disease or disc bulge.[14] (*Id.* at 323–24).

### 3.    State Agency Medical Consultants' Opinions

Dr. Richard Hadden ("Dr. Hadden") reviewed Guetti's medical records and assessed his impairments on January 15, 2011, at the initial level. (*Id.* at 42–59). Guetti was determined to have Disorders of the Back-Discogenic and Degenerative which was severe, but no discrete mental impairments were found. (*Id.* at 45, 54). Dr. Hadden found Guetti to be fully credible. (*Id.* at 45–46). A consultative exam was not required at this stage. (*Id.* at 44).

---

[14]    "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back." *Spinal Stenosis*, Mayo Clinic (June 28, 2012), http://www.mayoclinic.com/health/spinal-stenosis/DS00515.

In the residual functional capacity ("RFC") determination, Dr. Hadden found Guetti had physical exertion limitations which include occasionally being able to lift or carry twenty pounds, frequently being able to lift or carry ten pounds, being able to stand or walk with breaks for a total of six hours in an eight hour work day, being able to sit with normal breaks for a total of six hours in an eight hour work day, and being able to push or pull an unlimited amount. (*Id.* at 46). Guetti was also determined to have postural limitations including climbing ramps and stairs frequently, balancing frequently, stooping occasionally, kneeling frequently, crouching and crawling occasionally. (*Id.* at 46–47). Guetti was not found to have any manipulative, visual, communicative, or environmental limitations. (*Id.* at 47). Guetti was determined not to be disabled. (*Id.* at 50).

Dr. Gregory H. Salmi ("Dr. Salmi") reviewed Guetti's medical records and assessed his impairments on June 6, 2011 at the reconsideration level. (*Id.* at 64–73). A new injury or condition was reported since the last disability report which was that now Guetti had four herniated discs, a narrowing of his spine, arthritis, DDD (disorders of the back-discogenic and degenerative), depression, and a posterior disc herniation. (*Id.* at 65). A consultative examination of Guetti was required because the evidence was insufficient to support a decision on Guetti's claim; it was also noted that there was no treating source to do the consultative exam. (*Id.* at 67).[15]

---

[15]     "If [the claimant's] medical sources cannot or will not give [the SSA] sufficient medical evidence about [the claimant's] impairment for [the SSA] to determine whether [the claimant is] disabled or blind, [the SSA] may ask [the claimant] to have one or more physical or mental examinations or tests. [The SSA] will pay for these examinations. However, [the SSA] will not pay for any medical examination arranged by [the claimant or the claimant's] representative without [the SSA's] advance approval." 20 C.F.R. § 416.917. Such an examination is known as a consultative examination. *Id.*

At the consultative exam, Guetti noted that he did not have any depressive symptoms currently but had taken some medication for it a few months ago although he found it unhelpful. (*Id.*).  It was noted at the consultative exam that Guetti seemed somewhat depressed about not being able to work, but overall, his mental status exam was essentially normal.  (*Id.*).  No medically determinable mental impairments were found from the psychiatric exam of Guetti. (*Id.* at 68).  Guetti was found to have severe Disorders of the Back-Discogenic and Degenerative, but that he did not have any medically determinable mental impairment.  (*Id.* at 67–68).

Dr. Salmi found Guetti to be fully credible.  (*Id.* at 69).  Dr. Salmi reached the same RFC determination as Dr. Hadden.  *See* (*id.* at 46–47, 69–70).  Guetti was determined not to be disabled.  (*Id.* at 72).

### D.  Vocational Expert Testimony

Mary A. Harris ("Harris") testified as a vocational expert ("VE") at the hearing before the ALJ.  (*Id.* at 38–40, 139).  Harris holds a B.S. degree in psychology and a M.S. degree in Counseling from St. Cloud State University in St. Cloud, Minnesota.  (*Id.* at 130).  She identified use of hand tools, use of power tools, measuring, and constructing as transferrable skills from Guetti's past jobs.  (*Id.* at 38).  The ALJ asked the VE the following hypothetical question:

> What if you had a hypothetical individual, the same age, education and work background as Mr. Guetti, but this hypothetical individual was limited to light work but had transferrable skills that you've identified.  This person could never climb ladders, ropes or scaffolds, work around hazards and could perform other postural activities occasionally.  Could that individual do any of Mr. Guetti's past work?

(*Id.* at 39).  The VE answered the ALJ's question in the negative.  (*Id.*).  The ALJ then asked whether there was other work the hypothetical individual could perform.  (*Id.* at 40).  The VE answered yes, and identified that such an individual would be able to do cabinet assembly jobs

which are semiskilled and considered light work with an average of 1,600 jobs in Minnesota and 160,000 in the United States. (*Id.*).

On examination by Guetti's counsel, the VE identified that the cabinet assembly job would use transferrable skills including use of hand tools like a screwdriver, hammer, tape measurer, and/or level. (*Id.* at 40). The VE acknowledged that the hand tools she identified typically do not require more than thirty days to learn how to use. (*Id.*). Guetti's counsel then asked whether for an activity to be skilled, it generally requires thirty days of training. (*Id.*). The VE stated that it generally requires training or work experience. (*Id.*).

### E.    The ALJ's Decision

On August 20, 2012, the ALJ issued a decision finding that Guetti was not disabled under sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act. (*Id.* at 17–18). The ALJ reached his conclusion after following the required five-step evaluation. The ALJ considered: (1) whether Guetti was engaged in substantial gainful activity; (2) whether Guetti had a severe medically determinable impairment or a severe combination of impairments; (3) whether Guetti's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"); (4) whether Guetti could return to his past work; and (5) whether Guetti could do any other work in light of his residual function capacity, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)–(f), 416.920(a)–(f). At the outset, before performing the five-step analysis, the ALJ noted that Guetti meets the insured status requirements of the Social Security Act through December 31, 2014. (Admin. R. at 13).

At the first step, the ALJ found that Guetti had not engaged in substantial gainful activity since September, 1, 2009, which was the AOD. (*Id.* at 13). The ALJ noted that Guetti had

worked after the alleged onset of disability, but due to the lack of information about the hours and earnings of this work, the ALJ gave Guetti the benefit of the doubt, and found no substantial gainful activity.  (*Id.*).

At the second step, the ALJ found that Guetti's degenerative disc disease was a severe impairment.  (*Id.* at 13–14).  The ALJ found Guetti's history of hypertension and substance abuse were neither severe nor relevant impairments because both are "well controlled, non-symptomatic, or of less than a twelve-month duration."[16]  (*Id.* at 13).  The ALJ also determined that Guetti did not have a medically-determinable mental impairment.  (*Id.* at 13–14).  The ALJ found Guetti did not have any medically-determinable mental impairment and characterized any mental conditions that Guetti had as slight abnormalities that could not reasonably create anything more than minimal work-related limitations.  (*Id.*).

At step three, the ALJ determined Guetti did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (*Id.* at 14).  The ALJ specifically stated that "[t]he claimant's spinal disorder is not so severe as to meet or medically equal a listing."  (*Id.*).  The ALJ noted that Guetti is still capable of walking without an assistive device, and does not have nerve root or spinal cord compromise or compression, which he would have needed to show to equal a listing.  (*Id.*).

The ALJ determined at step four that Guetti was not capable of performing past relevant work.  (*Id.* at 16).  The ALJ also considered the entire record and concluded that Guetti "has the residual functional capacity to perform light work . . . except [Guetti] can never climb ladders,

---

[16]    Upon the Court's review of the Administrative Record, it is unclear whether Guetti had a history of substance abuse, but whether Guetti has this history or not does not impact the Court's analysis.  *See* (Admin. R. at 263, 308).

ropes, or scaffolding; cannot work around hazards; and can perform postural activities no more than occasionally." (*Id.* at 14). The ALJ noted that all of Guetti's past relevant work required a medium or greater level of exertion which is precluded by Guetti's limitation to work with a light level of exertion. (*Id.* at 16). In reaching his conclusions, the ALJ considered all Guetti's symptoms that could reasonably be deemed consistent with the objective medical and opinion evidence. (*Id.* at 14).

The ALJ applied the requisite two-step test for considering Guetti's symptoms. (*Id.*). First, the ALJ determined "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce [Guetti's] pain or other symptoms." (*Id.*). Second, the ALJ evaluated "the intensity, persistence, and limiting effects of [Guetti's] symptoms to determine the extent to which they limit [Guetti's] functioning." (*Id.* at 14–15). When statements about the "intensity, persistence, or functionally limiting effects of pain or other symptoms" are not supported by the medical evidence, the ALJ must determine the credibility of the statements. (*Id.*). The ALJ noted that the residual functional capacity assessment adequately addressed Guetti's physical impairment. (*Id.* at 15).

The ALJ found Guetti's impairment could reasonably be expected to cause the alleged symptoms, but that Guetti's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.*). The ALJ noted that although Guetti stated at the hearing that he could not walk for more than a few steps, sit for more than thirty minutes, bend, or lift, Guetti can still walk without an assistive device, perform self-care activities, and shop in a store for up to an hour, walk around the block, drive, and do computer research. (*Id.*). In addition, in June 2012 Guetti had to move equipment to prepare a house he was working on, had moved

residences in June 2011, and had times of undeclared income from work which Guetti denied at the hearing. (*Id.*). The ALJ also observed that Guetti had no difficulty sitting at the hearing or sitting, standing, or walking during a consultative evaluation. (*Id.*). This evidence led the ALJ to conclude Guetti's allegations were not fully supported by the evidence in the record, thus, the ALJ did not find Guetti's allegations more convincing than the medical opinions. (*Id.*).

The ALJ gave "great weight" to the opinions of Drs. Hadden and Salmi, state examiners, who diagnosed Guetti's severe impairment, limited him to light work, and limited his ability to climb or perform other postural activities. (*Id.*); (Guetti's Mem. in Supp. at 9). The ALJ also noted that he gave "substantial weight" to the state examiners' opinions that the ALJ found to be well-supported by the evidence in the record.[17] (*Id.*). The ALJ noted that Guetti "performs a broad range of daily living activities which include his ability to perform self-care activities, drive, shop in stores up to an hour, walk around the block, use a computer for research, pack and move from a residence, and move equipment and building supplies . . . in February 2012." (*Id.*). The ALJ gave "some weight" to a June 2011 recommendation from PT Mork that Guetti "should avoid bending, lifting, twisting, prolonged sitting, and frequent changes of position." (*Id.* at 16). This recommendation was based on Guetti's complaints of increased pain a week after he had moved residences. (*Id.*). The ALJ found this recommendation to be generally consistent with the opinions of Drs. Hadden and Salmi but he deferred to those opinions. (*Id.*).

At step five, the ALJ noted that Guetti is of advanced age, has at least a high school education, and has acquired work skills from past work, as the VE testified. (*Id.*). Based on Guetti's age, education, work experience, and residual functional capacity, the ALJ concluded

---

[17]     The ALJ seems to be using "great weight" and "substantial weight" both to refer to the impact of the opinions of Drs. Hadden and Salmi on his opinion. *See* (Admin. R. at 15); (Guetti's Mem. in Supp. at 9). Whether the ALJ afforded "great" or "substantial" weight to these opinions does not impact the Court's analysis.

that Guetti acquired work skills from his past relevant work that are transferable to other jobs that existed in significant numbers in the national economy. (*Id.* at 16–17). Therefore, the ALJ found that Guetti was not disabled under 20 C.F.R. § 404.1520(g) and § 416.920(g). (*Id.* at 17).

## II. STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

### A. Administrative Record

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429. If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. *Id.* §§ 404.967–.982, 416.1467. If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court. 42 U.S.C. § 405(g); 20

C.F.R. §§ 404.981, 416.1481.  An appeal to a federal court of either the Appeals Council or the

ALJ's decisions must occur within sixty days after notice of the Appeals Council's action.  *Id.*

### B.     Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings

are conclusive.  42 U.S.C. § 405(g).  The Court's review of the Commissioner's final decision is

deferential because the decision is reviewed "only to ensure that it is supported by 'substantial

evidence in the record as a whole.'"  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003)

(quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  A court's task is limited to

reviewing "the record for legal error and to ensure that the factual findings are supported by

substantial evidence."  *Id.*

The "substantial evidence in the record as a whole" standard does not require a

preponderance of the evidence but rather only "enough so that a reasonable mind could find it

adequate to support the decision."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Yet

this Court must "consider evidence that detracts from the Commissioner's decision as well as

evidence that supports it."  *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).  Thus, a

"notable difference exists between 'substantial evidence' and 'substantial evidence on the record

as a whole.'"  *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind
> might accept as adequate to support a conclusion."  "Substantial evidence on the
> record as a whole," however, requires a more scrutinizing analysis.  In the review
> of an administrative decision, "[t]he substantiality of evidence must take into
> account whatever in the record fairly detracts from its weight."  Thus, the court
> must also take into consideration the weight of the evidence in the record and
> apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, the Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate [residual functional capability] remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on the record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III. DISCUSSION

Guetti raises multiple issues in support of his Motion for Summary Judgment. First, Guetti challenges the ALJ's RFC determination. Specifically, Guetti argues that the ALJ failed to "give proper weight to the opinions of long[-]time treating physicians and improperly

substituted his own lay opinion." (Guetti's Mem. in Supp. of Mot. for Summ. J., "Guetti's Mem. in Supp.") [Doc. No. 12 at 12]. In addition, Guetti argues that in determining his RFC, the ALJ did not follow proper legal principles when determining Guetti's credibility. (*Id.*). Second, Guetti argues that the ALJ erred at step five of his analysis, which involved determining whether Guetti could do any other work in light of his residual function capacity, age, education, and work experience. (*Id.*). In his step five argument, Guetti contends that the ALJ did not follow proper legal principles in determining the transferability of skills, and therefore he misapplied medical vocational rules and his resultant decision is not based on substantial evidence in the record. (*Id.*). Moreover, Guetti argues that the ALJ presented the VE with an inappropriate hypothetical. (*Id.* at 17–18). For all of these reasons, Guetti argues that the ALJ's decision was not based on substantial evidence in the record as a whole.

## A. Residual Functional Capacity

Guetti contends that the ALJ failed to give proper weight to the opinions of treating physicians, improperly substituted his own lay opinion, and incorrectly determined Guetti's credibility in reaching his decision on Guetti's RFC. (*Id.* at 12–17). Thus, Guetti asserts that the ALJ's opinion is not based on substantial evidence in the record as a whole. The Commissioner, on the other hand, contends that the ALJ properly assessed Guetti's claim by relying on the record as a whole, conducting an independent review of the evidence, making his own observations, and relying on the opinions of the state agency physicians in reaching his decision. (Commissioner's Mem. in Supp. of Mot. for Summ. J. "Commissioner's Mem. in Supp.") [Doc. No. 14 at 7–8].

### 1.      Medical Opinions

Guetti argues that the ALJ did not give the correct weight to the opinions of treating physicians and instead applied his own lay opinion. (Guetti's Mem. in Supp. at 12–15). Guetti argues that the ALJ failed to even mention the opinions of the treating physicians and provided no reasoning for his failure to afford those opinions controlling weight. (*Id.* at 13). Guetti argues that the ALJ improperly substituted his own judgment for those of Guetti's treating doctors, essentially acting like a doctor. (*Id.* at 14). Guetti argues that the opinions of the treating physicians are supported by evidence and tests and are not contradicted. (*Id.*). Due to the ALJ's failure to consider the opinions of his treating doctors, Guetti alleges the ALJ's decision is not supported by substantial evidence on the record as a whole. (*Id.* at 15).

The Commissioner acknowledges that the ALJ failed to provide express reasons for not considering the opinions of Guetti's treating physicians, but argues that any error was harmless and that substantial evidence supports the decision. (Commissioner's Mem. in Supp. at 5, 7). The Commissioner argues that the medical opinions at issue in this case are mere conclusory forms that asked doctors to check off boxes to indicate Guetti was not able to work without any accompanying explanation. (*Id.* at 5). In addition, the Commissioner argues that the opinions do not support Guetti's claim because they do not state the period for Guetti being unable to work would last more than a year. (*Id.* at 6). The opinions are inconsistent with the record as a whole which shows Guetti worked after his alleged date of onset and continued daily activities inconsistent with total disability. (*Id.* at 6). The Commissioner argues that because the opinions at issue merely offer diagnoses of Guetti as suffering from back pain and the provider's belief that Guetti was disabled, the ALJ was not required to credit these unsupported opinions on

disability; the lack of observations and findings in the opinions means that the ALJ did not substitute his own lay opinion. (*Id.* at 7).

A treating physician is a physician that treats the claimant. *Ahlstrom v. Astrue*, No. 08-cv-5768(RHK/RLE), 2010 WL 147880, at *24 (D. Minn. Jan. 11, 2010) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006)). A medical opinion is defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Id.* (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); *Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004)).

Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding. 20 C.F.R. § 404.1527(c)(2). In fact, when supported by proper medical testing, and not inconsistent with other substantial evidence on record, the ALJ must give such opinion controlling weight. *Id.* "However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citation and internal quotation omitted).

An ALJ's failure to discuss or address the opinion of a treating physician is an error when the record does not contain a contradictory medical opinion. *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (citing *Prince v. Bowen*, 894 F.3d 283, 285 (8th Cir. 1990)). An ALJ can discount or disregard the opinion of a treating physician if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent

opinions. *Wildman*, 596 F.3d at 964 (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)). Treating physician's opinions are to be given no weight when they address "questions reserved for the Commissioner—such as whether a claimant is disabled, or is unable to work . . ." *Ahlstrom*, 2010 WL 147880, at *23 (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)). In addition, an ALJ need not accord deference to a treating physician's opinion that "consist[s] of nothing more than vague, conclusory statements." *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996). "[S]tatements that a claimant could not be gainfully employed are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) (citing *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996)).

Here, the ALJ failed to even cite the medical opinions provided by Guetti (the "Medical Opinion Forms") in reaching his determination. *See* (Admin. R. at 14–16). However, this does not necessarily mean that the ALJ did not consider the Medical Opinion Forms. *See Britton*, 622 F. Supp. 2d at 776 (citing *Black*, 143 F.3d at 386). Although the medical opinions at issue were merely Medical Opinion Forms that do not provide much more than a diagnosis and a checklist for doctors as they were to determine eligibility for state medical benefits, the Court considers them medical opinions, and the Commissioner, too, refers to the documents as medical opinions. *See* (Commissioner's Mem. in Supp.). The Court does not need to opine on whether the ALJ erred in not considering the Medical Opinion Forms, because the Court finds, below, that any error was harmless.

### 2. Harmless Error

An error is harmless if there is no indication that the ALJ would have reached a different decision without the alleged error. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (citing

*Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008)).  Guetti bears the burden of showing that the ALJ's failure to consider or give the proper weight to the medical opinions of the treating physicians was not harmless.  *See Peka v. Colvin*, CIV. 12-1593 (MJD/FLN), 2013 WL 4436180, at *10 (D. Minn. Aug. 16, 2013) (citation omitted).

Here, the documents Guetti cites as medical opinions of his treating doctors are merely one-page forms where the doctors indicated that Guetti had been diagnosed with low back pain.[18]  (Admin. R. 333, 335, 336, 339); *see Strongson v. Barnhart*, 361 F.3d 1066, 1071–72 (8th Cir. 2004) (affirming ALJ's decision to give little weight to the opinion of a medical source when the opinion was "'without explanation or support from clinical findings' and was 'not internally consistent with his own treatment notations.'"); *Britton v. Astrue*, 622 F. Supp. 2d 771, 775 (D. Minn. 2008) ("the ALJ was also entitled to reject Dr. Rahman's opinion because it was inconsistent with other medical evidence, including Dr. Rahman's own treatment records, and because Dr. Rahman did not provide clinical findings or medical support for his opinion.").  In addition, on each of the forms, the doctors indicated that Guetti "will not be able to perform any employment in the foreseeable future" by checking a box.  (*Id.*).  None of the doctors provided any time limitation on how long "the foreseeable future" was.  (*Id.*).  In one Medical Opinion Form, the doctor wrote that the condition was expected to last for three months or more.  (*Id.* at 335).  In two other Medical Opinion Forms, the doctor completing the Medical Opinion Form clearly wrote next to where he checked a box indicating Guetti's inability to work for the foreseeable future that a reassessment should be done in one month.  (*Id.* at 336, 339).  None of these Medical Opinion forms discuss or list any functional limitations that Guetti would have during work.

---

[18]    In one of the opinions, Guetti was diagnosed as having "chronic" low back pain, not merely low back pain.  (Admin. R. at 333).

Guetti argues that these Medical Opinion Forms provide a "detailed, longitudinal picture of Guetti's medical impairments and bring a unique perspective to the medical evidence that cannot now be obtained from the objective medical findings alone or from reports of individual examinations or brief hospitalizations." (Guetti's Mem. in Supp. at 15). The four Medical Opinion Forms at issue only span the time period from November 22, 2010 to April 27, 2011, omitting a good deal of time between Guetti's AOD in September 1, 2009 to the first Medical Opinion Form. In addition, one Medical Opinion Form was completed by Dr. Bergman who only saw Guetti once and who refused to see Guetti if he only wanted to treat his pain with Percocet. (Admin. R. at 333). In addition, the Court's review of the record suggests that Dr. Allen, who completed a Medical Opinion Form, only saw Guetti once before the Medical Opinion Form was completed. *See* (*id.* at 229, 339). The Court, thus, does not believe that the cited Medical Opinion Forms provide the detailed, longitudinal picture that Guetti contends.

The Medical Opinion Forms amount to conclusory statements as the forms were largely a checklist for doctors to complete, and provided little to no additional information beyond that on the form, did not require substantiation for conclusions, and did not detail clinical, diagnostic, or prognostic tests at all.[19] *See* (*id.* at 333, 335, 336, 339).

The Court finds that any error from the ALJ's failure to mention and then discount the Medical Opinion Forms was harmless error. First, the majority of the cited Medical Opinion Forms address an issue reserved for the Commissioner's decision: whether Guetti was disabled, which indicates that these Medical Opinion Forms should be given little to no weight. *See* (*id.*). Second, none of the Medical Opinion Forms provided any reasoning as to why they found Guetti

---

[19] Guetti argues that they are supported by neurological tests but none of the reports cite to these tests and Guetti has not provided the Court with argument as to how/why they are supported and by what tests. Because Guetti has not provided the Court with anything more than this conclusory statement—no evidence—the Court will not consider this argument.

unable to work for the foreseeable future and what the foreseeable future entailed. *See* (*id.*); *Strongson*, 361 F.3d at 1071–72; *Britton*, 622 F. Supp. 2d at 775. Third, there is evidence in the record that is inconsistent with these Medical Opinion Forms as doctors' notes from appointments in the record indicate that Guetti engaged in work after his AOD, worked on renovating a house, and moved his residence—all things inconsistent with the opinions of the doctors that Guetti was disabled. (*Id.* at 227, 229, 278, 326). These inconsistencies militate in favor of providing the medical opinions with no to little weight in the ALJ's determination. *See McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011). Fourth, the ALJ included back pain in his discussion and each of the cited Medical Opinion Forms diagnosed Guetti with low back pain, so to that extent, the ALJ's decision was consistent with the Medical Opinion Forms. Considering all of the deficiencies in the Medical Opinion Forms Guetti urges require consideration, even if the ALJ had had considered the Medical Opinion Forms explicitly, nothing suggests that these Medical Opinion Forms would have changed the ALJ's decision.

### 3. Substitution of Lay Opinion

Guetti contends that the ALJ improperly drew his own inferences about Guetti's functional ability and substituted his own lay opinion for that of Guetti's treating physicians, and that the ALJ's decision is not based on substantial evidence on the record as a whole. (Guetti's Mem. in Supp. at 13–14). The Commissioner, on the other hand, contends that the ALJ properly assessed Guetti's claim by relying on the record as a whole, conducted an independent review of the evidence, made his own observations, and relied on the opinions of the state agency physicians in reaching his decision. (Commissioner's Mem. in Supp. at 7–8).

The ALJ's RFC determination was virtually identical to that of Drs. Hadden and Salmi, which found Guetti could perform light work and limited Guetti's ability to climb and do other

postural activities. *See* (Admin. R. at 14–16, 42–50, 64–73). To the extent the ALJ's RFC determination was different from that of the state examining physicians, it was more favorable in that it included more limitations such as Guetti "can never climb ladders, ropes, or scaffolding; cannot work around hazards; and can perform postural activities no more than occasionally." (Admin. R. at 14–16, 42–50, 64–73). Despite stating that he was giving great weight to the opinions of the non-treating physicians, the ALJ also stated that he considered the objective medical evidence and opinion evidence in determining Guetti's RFC. (*Id.* at 14–15). Based on the Court's review, it has no reason not to believe that the ALJ considered all of the evidence in making his RFC determination. The Court, thus, finds that the ALJ relied on substantial evidence in the record as a whole in reaching his decision.

### 4. Guetti's Credibility

Guetti argues that the ALJ failed to follow the proper legal principles of Social Security Ruling 96-7p and *Polaski*, which governs Eighth Circuit credibility analysis. (Guetti's Mem. in Supp. at 15–17). Guetti argues that his allegations are consistent with the record as a whole, the ALJ did not apply appropriate case law and regulations, and the ALJ failed to consider Guetti's side effects from medication. (Guetti's Mem. in Supp. at 15–17). In addition, Guetti argues that the ALJ concluded Guetti's allegations were not consistent with his activities of daily living but the ALJ did not acknowledge that Guetti lives a sedentary lifestyle. (*Id.* at 15).

In the Eighth Circuit, *Polaski v. Heckler* provides the governing factors for a credibility determination. 739 F.2d 1320, 1322 (8th Cir. 1984). In assessing subjective complaints of pain, an ALJ must examine several factors including: "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Brown v.*

*Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322). Other relevant factors are the claimant's work history and objective medical evidence. *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999). "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility." *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)). The failure to address each *Polaski* factor separately does not render the ALJ's determination invalid. *See Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000); *Hicks v. Astrue*, CIV. 10-2930 (DWF/AJB), 2011 WL 3206960, at *11 (D. Minn. May 31, 2011) *report and recommendation adopted*, 2011 WL 3207049 (D. Minn. July 28, 2011).

An ALJ finding a claimant not to be credible, however, must provide reasons for discrediting the claimant and document the inconsistences uncovered. *Bakke v. Colvin*, Case No. 12-cv-538 (JNE/TNL), 2013 WL 4436178, at *5 (D. Minn. Aug. 16, 2013) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). An ALJ may discount subjective complaints if they are inconsistent with the evidence as a whole. *Id*. (citing *Polaski*, 739 F.2d at 1322). Because "[t]he ALJ is in the best position to determine the credibility of the testimony," this Court defers to an ALJ's decisions on credibility. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).

Discussion of the *Polaski* factors expressly is the preferred practice in the Eighth Circuit, however, if an ALJ does not expressly cite the *Polaski* factors but cites and conducts a thorough analysis under 20 C.F.R. §§ 404.1529 and 416.929 then such a decision constitutes an adequate

application of *Polaski* determination.[20]  *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)

(citing *Randolph v. Barnhart,* 386 F.3d 835, 842 (8th Cir. 2004)).  "Other relevant factors

include the claimant's relevant work history and the absence of objective medical evidence to

support the complaints."  *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998). The ALJ cannot

only rely on the lack of objective medical evidence in making his or her conclusion. *Ramirez v.

Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

The Court concludes that the record establishes that the ALJ did evaluate the entire

record, including the claimant's testimony, in accordance with the provisions of *Polaski*.  The

ALJ found that Guetti's impairment could be expected to cause the alleged symptoms but that

his "statements concerning the intensity, persistence and limiting effects of these symptoms are

not credible to the extent they are inconsistent with the above residual functional capacity

assessment."  (Admin. R. at 15).  In addressing the functional restrictions caused by Guetti's

impairment, the ALJ found that Guetti's "spinal impairment limits his exertional level, ability to

climb and perform other postural activities, and prevents him from sustainably working around

hazards."  (*Id.*).   The ALJ assessed Guetti's daily activities and found that Guetti can perform

self-care, shop in a store for up to an hour, drive, walk around the block, and use the computer,

pack and move from a residence, and move equipment and supplies in connection with a house

he was fixing up for sale in February 2012 although.  (*Id.*).  The ALJ also considered Guetti's

work record and noted that the record indicates Guetti had periods of undisclosed employment.

(*Id.*).

The ALJ also noted inconsistencies in Guetti's allegations and objective medical

evidence.  First, Guetti alleged that he could not "lift, bend, walk more than a few steps, or sit

---

[20]     Analysis under 20 C.F.R. §§ 404.1529 and 416.929 is similar to the *Polaski* factors.  *See*
20 C.F.R. §§ 404.1529, 416.929.

over thirty minutes[,]" however, the ALJ noted that there was evidence of periods of undeclared income after the alleged onset date, Guetti exhibited no trouble sitting during the hearing or the consultative examination, partook in a range of daily activities, and that Guetti walked without the use of an assistive device. (*Id.*). The ALJ also noted that the record indicated that Guetti experienced increased pain after moving residences in June 2011 and selling a house he had been working on in February 2012. (*Id.*).

Guetti argues that the ALJ erred in determining Guetti's credibility by failing to acknowledge that Guetti's statements were consistent with treating physicians' opinions. (Guetti's Mem. in Supp. at 9). These Medical Opinion Forms represent check-off boxes indicating that Guetti could not work for the foreseeable future and suffered from back pain without any support, as discussed above. *See* (Admin. R. at 333, 335, 336, 339). Therefore, Guetti's argument that his statements were consistent with these opinions does not carry much weight as the Court has already determined that these opinions are inconsistent with other objective medical evidence making the ALJ's failure to even cite to these opinions harmless error.

Guetti highlights that the ALJ did not consider his alleged side effects from Percocet which include "creat[ing] sleeplessness, and it's difficult to stay awake at points. . . . I have trouble like balancing [a] checkbook." (*Id.* at 32–33); (Guetti's Mem. in Supp. at 17). Although it may have been preferable if the ALJ specifically addressed Guetti's side effects, the ALJ is not required to refer to every part of the record in making a credibility determination and a determination will be upheld when there is sufficient support for the determination. *Roberson v. Astrue*, 481 F.3d 1020, 1026 (8th Cir. 2007).

Guetti also suggests that his daily activities actually represented a sedentary physical exertion limitation and not a light physical exertion limit.[21] (Guetti's Mem. in Supp. at 18). The ALJ, however, found that evidence in the record, including Guetti's continued working, moving of his residence, and remodeling a home, as well as Guetti's daily activities, support a conclusion that Guetti was limited to at least a light physical exertion level. (Admin. R. at 14–16); *see Besler v. Sullivan*, 963 F.2d 176, 178 (8th Cir. 1992) (affirming an ALJ's determination that the claimant was not limited to sedentary work when the medical opinion cited in support of the sedentary limitation by the claimant was discounted by the ALJ as inconsistent with the claimant's own testimony); *Hutsell v. Sullivan*, 892 F.2d 747, 749 (8th Cir. 1989) (finding that medical evidence in the record along with work activity that was not enough to constitute substantial gainful employment provided adequate support for the ALJ's limitation of the claimant to light work).

Here, the ALJ provided a thorough discussion of the record evidence in determining that Guetti's allegations were not entirely credible. *See* (Admin. R. at 14–15). The ALJ also used several *Polaski* factors in his analysis although not expressly terming them "*Polaski* factors."

---

[21] A sedentary exertion limitation "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

A light exertion limitation, "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

*See* (*id.*).  The Court finds substantial evidence supported the ALJ's credibility conclusion.  The ALJ's credibility determination should be affirmed.  *See Ollila v. Astrue*, CIV. 09-3394 (JNE/AJB), 2011 WL 589037, at *15 (D. Minn. Jan. 13, 2011) *report and recommendation adopted*, 2011 WL 589588 (D. Minn. Feb. 10, 2011) (citing *Ellis v. Barnhart,* 392 F.3d 988, 996 (8th Cir. 2005)); *Petersen v. Astrue*, No. 08-cv-4771 (RHK/JJK), 2009 WL 1657461, at *13–16 (D. Minn. June 11, 2009).

### 5.      Substantial Evidence

The ALJ considered all of the record evidence, all of Guetti's symptoms that were consistent with the objective medical evidence, the opinions of the two state examiners, and a recommendation of Guetti's physical therapist that recited Guetti's limitations.  (Admin. R. at 14–16).  Thus, substantial evidence in the record supports the ALJ's RFC determination.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002); *Peka v. Colvin*, CIV. 12-1593 (MJD/FLN), 2013 WL 4436180, at *12–13 (D. Minn. Aug. 16, 2013).

### B.      Step Five Alleged Errors

Guetti alleges that the ALJ erred at step five of his analysis when he failed to apply proper legal principles in addressing the transferability of skills and that the ALJ presented an improper hypothetical to the VE such that substantial evidence does not support the ALJ's decision.

### 1.      Transferability of Skills

Guetti argues that the ALJ did not apply the correct legal standards in addressing the transferability of skills and this rendered his decision a misapplication of the Medical Vocational Rules that was not supported by substantial evidence.  (Guetti's Mem. in Supp. at 17).  Guetti argues that the VE incorrectly testified at the hearing that Guetti had the transferrable skill from

his previous employment of using hand tools.  (*Id.* at 19).  The VE also testified that such skills would not require more than thirty days to learn, which Guetti argues, precludes these skills from being transferrable.  (*Id.*).

A skill is defined as:

[K]nowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (*requires more than 30 days to learn*). It is practical and familiar knowledge of the principles and processes of an art, science[,] or trade, combined with the ability to apply them in practice in a proper and approved manner. This includes activities like making precise measurements, reading blueprints, and setting up and operating complex machinery.  A skill gives a person a special advantage over unskilled workers in the labor market.

SSR 82-41, 1982 WL 31389, at *2 (Jan. 1, 1982) (emphasis added).  The regulation goes on to provide that an individual does not gain skills from an unskilled job.  *Id.* at *2.  Unskilled jobs are those that "are the least complex types of work.  . . . [and] persons can usually learn to do them in 30 days or less."  *Id.*  Transferability is defined as "applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs."  *Id.*  Transferable skills are those that "can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."  20 C.F.R. § 404.1568(d)(1).

The Eighth Circuit provided guidance on determining the existence of transferrable skills by referencing the Dictionary of Occupational Titles ("DOT").  *See Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998).

This method of determining the existence of transferable skills is explicitly allowed by 20 C.F.R. § 404.1566(e).  *See Stout v. Shalala,* 988 F.2d 853, 854 (8th Cir.1993).  Moreover, the ALJ's conclusion [on the transferability of skills] in this regard is bolstered by reference to [the DOT], a Labor Department guide to job

ability levels that has been approved for use in Social Security cases. *See* 20 C.F.R. § 404.1566(d)(1); *see also Porch v. Chater,* 115 F.3d 567, 571 (8th Cir.1997). The DOT is the Commissioner's primary source of reliable job information. *See* 20 C.F.R. § 404.1566(d)(1). The Commissioner uses the DOT to classify occupations as skilled, semiskilled or unskilled. *See* 20 C.F.R. § 404.1569.

In the DOT, each job is assigned a number that reflects the job's specific vocational preparation time (SVP), i.e., how long it generally takes to learn the job. *See* United States Dep't of Labor, Employment and Training Admin., *Dictionary of Occupational Titles,* Vol. II, Appendix C at 1009. An SVP level of "three" indicates that a job requires more than one month and up to three months of training; while an SVP level of "four" would require more than three months and up to six months of training. *See id.* at 1009. Unskilled work, on the other hand, requires less than thirty days training. 20 C.F.R. § 404.1569(a); 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00. Unskilled work corresponds to an SVP of one or two in the DOT. *See* DOT at 1009.

*Id.*

The Eighth Circuit then considered the past jobs of a claimant to determine whether those skills had a high enough SVP to allow the claimant to acquire transferable skills. *Id.* Because the claimant's past work had SVP that was higher than that corresponding to unskilled work, the Eighth Circuit found that the claimant had acquired skills at his semiskilled past jobs. *Id.* Thus, the Court looks to the skill level of Guetti's past employment to determine if he could have acquired transferrable skills, and does not, as Guetti contends, look to the time it takes to learn the skill.

The VE testified that Guetti's past work included: (1) "carpenter, which is a skilled and medium job per DOT but heavy as performed[,]" (2) "dish washer that is unskilled and medium[,]" (3) "cook is skilled and medium[,]" and (4) "cabinet maker is skilled and medium." (Admin. R. at 38). The VE then identified transferrable skills from prior work including "use of hand tools, use of power tools, measuring, [and] constructing." (*Id.*). Guetti's past work that could have provided transferrable skills, thus, included carpenter, cook, and cabinet maker as they are all semiskilled or skilled. In the DOT, jobs that are semiskilled or skilled have SVP's

39

ranging from three to nine. *See* SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). Because Guetti's prior work included semiskilled and skilled work, the skills he learned during these jobs are transferrable. Moreover, one skill specifically identified by the VE, measuring, is actually used as an example of a skill in SSR 82-41. *See* 1982 WL 31389, at *2 (Feb. 26, 1979). The Court, therefore, concludes that Guetti did obtain transferrable skills during his prior work.[22]

## 2. Hypothetical Question

Guetti argues that the ALJ's reliance on the vocational expert in determining Guetti could perform light work with transferrable skills was legally flawed because "the question posed to the vocational expert did not outline all of the functional limitations suffered by Guetti." (Guetti's Mem. in Supp. at 18). Guetti argues that the ALJ did not cite conditions, define light work, or postural activities, and failed to address Guetti's side effects from the medication when he asked the VE to consider a hypothetical person. (*Id.*).

"In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record." *Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999). "'[T]he ALJ is only required to incorporate into the hypothetical those impairments and limitations which have been accepted as credible.'" *Gorton v. Astrue*, No. 06-cv-4903 (PJS/JSM), 2008 WL 583703, at *29 (D. Minn. Feb. 28, 2008) (quoting *Daniel v. Barnhart*, Case No. 01-cv-852 (JRT/ALB), 2002 WL 31045847, at *4 (D. Minn. Sept. 10, 2002)).

---

[22] Because the Court has already explained that Guetti's alleged side effects from his medication are not entirely supported by the record, the Court rejects Guetti's argument that the side effects from his medications, like not being able to balance a checkbook, prevent him from performing the transferrable skills of use of hand tools, power tools, measuring, and constructing. *See* (Guetti's Mem. in Supp. at 18–19).

In addition, because the Court finds Guetti has transferrable skills from his past work, Guetti's arguments citing to 20 CFR 404p App. 2 §§ 201.14 and 202.06 are rejected as these provisions deal with claimants who do not have any transferrable skills.

Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

*Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (citations omitted).

In presenting his hypothetical to the VE, the ALJ stated:

What if you had a hypothetical individual, the same age, education and work background as Mr. Guetti, but this hypothetical individual was limited to light work but had transferrable skills that you've identified. This person could never climb ladders, ropes or scaffolds, work around hazards and could perform other postural activities occasionally.

(Admin. R. at 39).

Social Security Regulation 00-4p, explains that "evidence provided by a VE . . . should be consistent with the occupational information supplied by the DOT." SSR 00-4p, 2000 WL 1898704, at *2 (December 4, 2000). Moreover, if the VE's evidence conflicts with the DOT, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE." *Id.*; *see Gorton*, 2008 WL 583703, at *30.

Guetti argues that the hypothetical should have included the side effects from his medication, however, because the record does not support this allegation, the ALJ did not have to include it in his hypothetical. For example, the evidence in the record indicates that Guetti worked while taking Percocet and had also denied side effects from Percocet. *See* (Admin. R. at 53, 308). Guetti's argument that the ALJ did not properly cite to the conditions of the hypothetical person fails because the ALJ described the limitations he found as consistent with the record in his RFC determination. (*Id.* at 16, 39). Moreover, Guetti did not ask for any clarification on the limitations used in the hypothetical in his examination of the VE, which indicates that Guetti understood the hypothetical question. *See* (*id.* at 30–41).

To the extent Guetti argues that the ALJ should have more specifically defined "other postural activities occasionally" in his hypothetical to the VE, his argument fails because the record establishes that Guetti could perform all postural activities occasionally, other than climbing, which the ALJ specifically listed in his hypothetical to the VE. (*Id.* at 39, 46–47, 55–56, 69–70, 79–80). Moreover, Guetti advances this argument in his contention that he cannot perform the job of cabinet maker, identified by the VE, because it requires frequent reaching and Guetti is limited to occasional reaching. (Guetti's Mem. in Supp. at 19). This argument fails because the opinions of the state examining physicians, upon which the ALJ relied, listed postural limitations as: climbing ramps/stairs, climbing ladders/ropes, scaffolds, balancing, stooping, kneeling, crouching, and crawling. (Admin. R. at 46–47, 55–56, 69–70). The opinions of the state examining physicians state that Guetti has no manipulative limitations. (*Id.*). Thus, even though, SSR 85-15 does not distinguish between postural and manipulative limitations, the Court is convinced that reaching is considered a manipulative limitation based on the state examining physicians' opinion forms, which listed postural limitations, and limited them, but did not include reaching. *See Batta v. Astrue*, Case No. 11-cv-293 (SRN/LIB), 2012 WL 956512, at *3 (D. Minn. Jan. 31, 2012) *report and recommendation adopted*, 2012 WL 956506 (D. Minn. Mar. 21, 2012) (state agency physician listing manipulative as "reaching, handling, fingering, or feeling[.]").

Guetti also argues that the ALJ's hypothetical was erroneous because the ALJ did not define light work. (Guetti's Mem. in Supp. at 18). Social Security Regulation 00-4p provides that a VE's testimony is to be consistent with the DOT and any inconsistency with the VE's testimony and the DOT is to be elicited. 2000 WL 1898704, at *2 (Dec. 4, 2000). The VE's failure to define light work here is not erroneous because the definition is presumed to be

consistent with the DOT per SSR 00-4p. Moreover, the ALJ explicitly asked the VE whether any of her testimony was in conflict with the DOT, to which she responded negatively. (Admin. R. at 40). In addition, at other places, the VE explicitly referred to the DOT, illustrating her familiarity with it. (*Id.* at 38). The VE's use of light work, therefore, is consistent with the DOT and did not need to be defined where the parties do not challenge the skills of the VE.

The ALJ, thus, relied on the VE's response to a hypothetical question that assumed Guetti had all of the limitations and impairments that the ALJ found the record supported. The Court has found the ALJ's RFC determination supported by substantial evidence in the record as a whole, and therefore, the ALJ did not err in relying on the VE's testimony in response to the hypothetical question. *See, e.g.*, *See Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007). The Court recommends that the ALJ's decision be affirmed.

## IV.     RECOMMENDATION

Based on all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Guetti's Motion for Summary Judgment [Doc. No. 9] be **DENIED**;

2.      The Commissioner's Motion for Summary Judgment [Doc. No. 13] be **GRANTED**; and

3.      Judgment be entered and the case be dismissed.


Dated: December 6, 2013

> *s/ Steven E. Rau*
> STEVEN E. RAU
> United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **December 20, 2013**, a writing which

specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.